BRUNSWICK–BALKE–COLLENDER CO. v. ROSATTO.

(Circuit Court of Appeals, Third Circuit, November 12, 1908.)

No. 12.

1. PATENTS (§ 328*)—INVENTION—BOWLING ALLEY.
　　The Wiggins patent, No. 623,933, for a bowling alley, in which a con-
cave side gutter is substituted for the square form in previous use, is
void for lack of patentable invention.
　　[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 328*)—INVENTION—RUNWAY FOR BOWLING ALLEY.
　　The Wiggins patent, No. 554,611, for a ball runway for bowling al-
leys, is void for lack of patentable invention.
　　[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Eastern
District of Pennsylvania.

For opinion below, see 159 Fed. 729.

M. B. Philipp and James Q. Rice, for appellant.

E. Hayward Fairbanks, for appellee.

Before GRAY and BUFFINGTON, Circuit Judges, and CROSS,
District Judge.

BUFFINGTON, Circuit Judge. In the court below the Brunswick-
Balke-Collender Company, owner of patent No. 623,933, for a bowling
alley, granted April 25, 1899, to William H. Wiggins, filed a bill
against Frank Rosatto, charging infringement thereof. On final hear-
ing that court, in an opinion reported at 159 Fed. 729, held the
patent void. From a decree dismissing the bill the Brunswick Com-
pany appealed. The object of the patentee was to improve the con-
struction of bowling alleys with reference to the "ball-gutters" or
troughlike conduits alongside the alleyway. These gutters serve to
carry to the pit end of the alley the balls thrown off the alley-bed
by a player. Prior to this device the side gutters of bowling alley-
beds were rectangular in cross-section, and when misplayed balls en-
tered them they could rebound and strike the side of the alley-bed.
This impact sometimes slivered the outer edge of such alleyway and
scaled off the balls around the finger holes. By making the gutter of
suitable circular proportion, a misplayed ball was more apt to follow
the central line of the gutter. Having no angular corner, the curved
gutter was more easily kept clean. On this device a single claim, to
wit:

　"The combination, with the bed, or ball-way A, of a bowling alley; and a
suitable stringer, or strip, running parallel with the edge of the alley-bed at
a suitable distance therefrom, of a bottom piece C, the top surface or which
is concave, in cross-section, and operates to cause a ball rolling thereon to
travel centrally thereof; all in substantially the manner and for the purposes
hereinbefore set forth"—

was granted. The sphere of invention here involved is very narrow,
for it consists in substituting a circular for a square gutter alongside

_____
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

an alley-bed. The use as a runway for balls of a circular trough of proper proportions was known in game construction. Thus, not as anticipatory of Wiggins' particular combination of circular troughs, but as showing their use generally in game devices, we may refer to the patent of Arff, No. 279,313, where a circular side-trough was used as a suitable form of gutter ball return in a game played on something like a billiard table.

"The outer walls of these troughs," says Arff, "extend up above the level of the table surface, so as to prevent any ball from being driven entirely off the table and onto the floor; or they constitute, in other words, both a guard-rail and a return trough."

Indeed, Arff suggested the adaptation of his device to bowling alleys, saying:

"In making use of our invention, we do not confine it to any particular game, and we may arrange it to be played with balls and a cue, after the manner of billiards; or we may use it on a very much larger scale, to be used in the place of a bowling alley."

In the Patent Office, Wiggins' application was rejected by the primary examiner, and on appeal his action was affirmed by the board of examiners in chief. In doing so that board said:

"The old ball gutters were rectangular in cross-section and had flat bottoms. This permitted the balls, after they had left the alley, to bump from side to side. This difficulty the applicant remedies by making the bottom of the gutter curved. This construction would remedy the difficulty somewhat in that a central path is provided for the balls, though they would still, if traveling with any speed, butt against the stringer. It is of course obvious that a gutter with a curved bottom will to some extent prevent the ball from rolling from side to side, and the only question that remains is whether it required anything more than ordinary observation to determine the cause of the previously existing difficulty. The patent to Arff et al. describes a device primarily intended for a game to be played on a table, but is stated to be intended also for use on a large scale as a bowling alley. * * * While the conditions of use of this game are hardly such as to suggest the remedy for the difficulty which the applicant states exists, the patent has a gutter with means for causing the balls to roll centrally therein. Even without this patent we regard the device claimed as lacking in new invention."

On appeal to the commissioner, the application was granted, not because, as shown by his opinion, the commissioner was convinced the device involved patentability, but to give the applicant an opportunity to test the question in the courts. Thus he says:

"That the improvement is new and useful has not been denied by either of the lower tribunals, and although it is simple, from the showing made by appellant at the hearing before me, I am not willing to say that the improvement made by him is obvious to one skilled in the art. At any rate, I am willing to give the benefit of the doubt as to the patentability to the applicant, in order that he may have an opportunity to defend his invention in court, should it be infringed."

The question of patentability has had the painstaking attention characteristic of the judge below. In his opinion he says:

"Nor, as bearing on the question of invention, was the adoption of this device attended by any of the circumstances which are sometimes relied on to make that out. There was no preceding and insistent demand, for instance, for a new character of gutter to take the place of the old one, the defects of which were recognized and remained unsupplied. Neither were other in-

ventors striving unsuccessfully to attain the same end. Nor was the advance made by the concave over the square gutter so marked, nor has it gone into such immediate and unquestioned use, as to show that it met an expectant need. * * * It is to be observed as to this that a concave gutter is a common and not at all complicated construction, which any ordinary workman possessed of the usual mechanical skill could produce, if the necessity for and the desirability of it was seen. And it would no doubt surprise most of them to learn that it had been monopolized by a patent, which prevented its use, if for any reason they were called to put one in. It is also a most natural one for a ball, conforming, as it does, to its shape, and is found in the patents referred to above in a cognate and suggestive, if not a directly anticipating, use. The patentee thus invented nothing new in this regard, but simply took that which was at hand, in general use, and applied it without change of function in place of another common form, because of its supposed superiority for the purpose."

In these conclusions we agree. Moreover, it seems clear that the originality here involved was the recognition of a hitherto overlooked evil, and not a finding of means to overcome it. Thus an expert bowler, speaking of the chipping of balls and splintering the alley-bed sides, said:

"Although a close observer of these conditions and effects, it never occurred to my mind exactly what were the causes thereof, until the introduction into use of the Wiggins improved form or construction of ball gutters, which I knew to have practically overcome wholly the evil effects which existed when the same alley-beds and the same sort of balls were previously used in connection with the old-fashioned ball gutters on either side of the ball-way."

And the patentee himself says:

"No bowling alley builder, or alley keeper, or bowler, ever discovered, until I found it out, that a fruitful, if not the main, cause of the rapid wear of the balls (especially the larger ones) was the impingement and chafing of the balls' surface against the sharp, hard edge of the alley-bed whenever a ball happened to be misplayed and rolled down in the 'ball-gutter' to the alley pit (without striking a pin), especially in cases in which a twisting roll was made by the expert bowler. Nor was it at all obvious to those skilled in the art of building alleys, or that of rolling tenpins, that this abrasion of the balls misplayed down the gutter was the cause of a very apparent wearing away, each season, of the edges of the playing surface or 'ball-way' of the alley, and that this evil was aggravated in the case of expert bowlers, who mostly play the twisting stroke or roll, because the ball played with a twist that leaves the ball-way and travels to the pit in the 'ball-gutter' of the alley will hug the edge of the ball-way, so to speak, and the impingement, with a grinding action, of such ball against the edge of the playing surface will not only effect more injury to the ball than arises in the case of a misplayed plain stroke, but will more injuriously affect the edge of the playing surface of the alley."

Now when Wiggins recognized the evil, he did not have to invent anything to overcome it. There were no experiments or tentative efforts. He did not invent circular pathways for balls, nor invest them with any new function when they were used as ball-troughs along an alley-bed. As an experienced builder, he was able to remedy the evil as soon as he recognized it, for it was the recognition of the evil, and not the means of overcoming it, that characterized what he did. It was one of those mechanical problems which, as soon as an evil was recognized, one skilled in the art was able to meet. We recognize the fact that this patent was sustained in the Second Circuit in 145 Fed. 353, and that decision affirmed in 146 Fed. 1022, 76 C. C. A. 678. In neither case was there any discussion of the question of patentability.

On the other hand, the reasoning of Judge Lacombe on that question in 124 Fed. 551, where he denied a preliminary injunction on the patent, and of Judge Archbald in the present case, satisfy us that no such inventive disclosure has been here made as warrants the monopoly for years in bowling alley construction of a circular side-trough.

As to the other patent to Wiggins, No. 554,611, issued February 11, 1896, of which infringement is also charged, little need be said. The patent concerns the prior-used return-troughs of bowling alleys in which both the pit and player ends were elevated. The elevation at the pit end served to impart, and that at the players' to impede, ball impetus. In this way chipping of the balls and injuries to players' fingers were avoided; the small balls dropped through a hole in the gutter as soon as they reached the top of the players' incline, while the larger passed on to the stop post. Wiggins sought to improve this construction by locating the small ball drop-hole at the foot of or part way up the incline, instead of at the top, where it was in the prior devices. We are of opinion this involved no patentability, and we avoid needless repetition by adopting as the opinion of this court the satisfactory discussion of that question by the court below.

Finding no error, the decree below is affirmed.